IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EBRO FOODS, INC., | ) | Case No. 09 B 10101 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| G AND G PEPPERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 09 A 00500 |
| | ) | |
| EBRO FOODS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

This adversary proceeding, arising in a Chapter 11 bankruptcy, is before the court for entry of judgment after a trial on stipulated facts. The adversary involves a dispute between debtor Ebro Foods, Inc. ("Ebro"), a food manufacturer, and one of its suppliers, G and G Peppers, LLC ("G&G"). G&G shipped jalapeño peppers to Ebro, and Ebro admittedly did not pay for them. There are two issues in dispute. The first is whether G&G's claim against Ebro includes the attorneys' fees that G&G incurred in pursuing its collection efforts. The second is whether G&G's claim, whatever its amount, gives rise to a lien on Ebro's assets under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a *et seq.* ("PACA"). As discussed below, the contract between Ebro and G&G does not encompass attorneys' fees because Ebro

did not agree to a contract modification providing for their payment, and G&G's contract claim does not give rise to a PACA trust because G&G did not provide the notice that PACA requires.

## Jurisdiction

Under 28 U.S.C. § 1334(a), the federal district courts have original and exclusive jurisdiction of all cases under the Bankruptcy Code. However, the district courts may refer these cases to the bankruptcy judges for their districts under 28 U.S.C. § 157(a), and the District Court for the Northern District of Illinois has done so through its Internal Operating Procedure 15(a). When presiding over a referred case, a bankruptcy judge has jurisdiction under 28 U.S.C. §157(b)(1) to enter appropriate orders and judgments as to core proceedings within the case. The issues in the current adversary proceeding, concerning claims against the debtor's estate and a dispute over interests in property of the debtor, are core matters. 28 U.S.C. § 157(b)(2)(B), (K), and (O).

## Findings of Fact

Because the parties agreed to try this matter on stipulated facts, the material facts are not in dispute.[1]

Ebro purchases perishable agricultural commodities, subject to regulation under PACA, as part of its food manufacturing business. (Complaint ¶ 3.) At the time of its purchases from G&G, Ebro was licensed as a dealer under PACA by the United States Department of Agriculture ("U.S.D.A."). (*Id*.) G&G is an Indiana limited liability company engaged in the

---

[1] The facts are taken from the following filings, among others: G&G's complaint (Adv. Docket No. 1, "Complaint"); G&G's trial exhibits (Adv. Docket No. 32, cited as "G&G Ex. __"); and Ebro's trial exhibits (Adv. Docket No. 31, cited as "Ebro Ex. __").

2

business of buying and selling perishable agricultural commodities and has been licensed as a PACA dealer at all relevant times. (*Id.* ¶ 2.)

Between September 26 and October 4, 2007, Ebro sent three purchase orders to G&G for the purchase of jalapeño peppers. (Ebro Ex. 1, 3 & 4.) Each of the purchase orders specified the amount of peppers desired, a price per pound, a required delivery date, a delivery protocol, and the payment terms—"Net 30 days." (*Id.*) The total purchase price for the three orders was $42,920.00. (Complaint ¶ 5.) The purchase orders also stated, "To ensure that this order was received and processed, please sign and return via fax." (Ebro Ex. 1, 3 & 4.) A representative of G&G signed each of the purchase orders, and G&G faxed the signed orders to Ebro. (*Id.*) [2]

In response to the orders, G&G sent three shipments of peppers to Ebro; the shipments arrived between October 2 and October 10, 2007. (Complaint ¶ 5.) On or about the date Ebro received each shipment, G&G also faxed invoices requesting payment. (Ebro Ex. 8-10.) The invoices were forms including both a completed box stating that the payment terms were "PACA 'terms'" and a preprinted statement that G&G had a statutory trust claim under Section 5(c) of PACA. (*Id.*) [3]  The preprinted language also stated both that interest would accrue on any past-due amounts and that "[b]uyer agrees to pay all costs of collection, including attorneys' fees."

---

[2] During a hearing on October 7, 2009, G&G's counsel stipulated that the signatures of the G&G agent were authentic.

[3] G&G's full PACA statement was the following:

The perishable agricultural commodities listed on this invoice are sold subject to statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

3

(*Id.*)  None of these trust and payment provisions appeared in Ebro's purchase orders.  (Ebro Ex. 1, 3 & 4.)

Ebro did not pay for the peppers it received from G&G, and on February 27, 2008, G&G filed a complaint with the U.S.D.A., seeking reparations for Ebro's non-payment.  (G&G Ex. 6.)  Ebro did not participate in the administrative proceeding, and the U.S.D.A entered a default order on August 8, 2008, awarding G&G $42,920 with interest at 2.3% per annum from November 1, 2007, until the date of payment, as well as $300 in costs.  (G&G Ex. 7.)  G&G sought to enforce the reparations order by proceeding against Ebro in federal district court.  *See G & G Peppers, LLC v. Ebro Foods, Inc., et al.*, No. 09 C 489 (N.D. Ill.).  The district court case was automatically stayed upon the filing of Ebro's bankruptcy filing in March 2009.

On June 19, 2009, G&G commenced the current adversary proceeding with a three-count complaint.  In Count I, G&G seeks an award of damages, including attorneys' fees and interest, for Ebro's breach of the parties' contracts.  (Complaint ¶¶ 4-9.)[4]  In Counts II and III, G&G seeks a turnover of trust funds to satisfy its claim.  (*Id.* ¶¶ 10-20.)

Ebro admits that it breached its contracts with G&G and that it owes $42,920 for the peppers.  (*See* "Ebro's Trial Brief" (Adv. Docket No. 35) at 3.)  However, Ebro contests G&G's claim for attorneys' fees and denies that G&G is entitled to a statutory trust under PACA.  To resolve these disputes, the parties stipulated to the material facts and submitted simultaneous briefs in support of their positions.

---

[4] Although Count I asserts that G&G is entitled to an 18% contractual interest rate on its claim, neither party has objected to the U.S.D.A.'s order awarding G&G 2.3% interest.  To the contrary, G&G affirmatively states that it is seeking to enforce the reparations order.  (*See* "G and G Peppers, LLC's Post-Trial Brief" (Adv. Docket No. 36) at 8.)   PACA provides for the prima facie validity of reparations orders, 7 U.S.C. § 499g(b), and because neither party has challenged the interest award in the order here, it will be enforced.

**Conclusions of Law**

Both of the issues in dispute here are resolved by statute. Whether G&G has a contractual right to attorneys' fees is governed by Illinois' enactment of the Uniform Commercial Code.[5] Whether G&G has a trust in support of its claim against Ebro is governed by PACA.

A. *G&G's claim for attorney fees.*

Article 2 of the Illinois U.C.C. governs all "transactions in goods." 810 ILCS 5/2-102 (2006). Where, as here, both parties to a transaction are merchants and the purchase price is at least $500, the U.C.C. provides that a party can be liable only if it signs a written document indicating that a contract has been made. 810 ILCS 5/2-201(1) (2006). One way in which a party can become liable on a contract is through a writing that accepts a proposed contract. 810 ILCS 5/2-206 (2006). In this case, G&G accepted the contract proposed in Ebro's purchase orders by signing the orders and faxing them to Ebro.[6]

G&G does not dispute that the parties had binding contracts—indeed it asserts a breach of contract claim against Ebro. Rather, it contends that the additional attorneys' fee term

---

[5] Illinois law is applied here because Ebro's business is located in Illinois and because the parties have not argued for the application of any other state's law. *See In re Stoecker,* 5 F.3d 1022, 1029 (7th Cir. 1993) ("Where . . . the parties do not make an issue of choice of law, [the court has] no obligation to make an independent determination of what rule would apply if they had made an issue of the matter.").

[6] G&G contends that its representative's signatures simply acknowledged receipt of the purchase orders rather than agreement to their terms. However, the purchase orders requested G&G's signature "to ensure that [the] order was received *and processed*" (Ebro Ex. 1, 3 & 4 (emphasis added)), thus seeking confirmation not only of receipt of the orders, but also of their being filled. This interpretation of the acknowledgement is bolstered by G&G's actual shipping of the goods specified in the purchase orders without objection or prior amendment. *See* 810 ILCS 5/2-206(b) (2006); *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.*, 218 F. Supp. 2d 974, 977 (N.D. Ill. 2002) (shipment of goods is an acceptance of a purchase order).

5

included in its invoices should be incorporated into the parties' contracts pursuant to 810 ILCS 5/2-207(2) (2006). Under this provision, when both parties are merchants, terms first included in an acceptance or written confirmation of a proposed contract are incorporated into a contract offer unless: (i) the offer expressly limits acceptance to the terms of the offer; (ii) the additional terms materially alter the contract; or (iii) notification of objection to the additional terms was given within a reasonable time. *Id.*; *see also Sethness-Greenleaf, Inc. v. Green River Corp.*, 65 F.3d 64, 66 (7th Cir. 1995).

There are two reasons why the attorneys' fee provision in G&G's invoices is not part of the parties' contracts. First, the classic "battle of the forms" addressed by § 2-207 occurs when a party's acceptance includes terms that conflict with or are in addition to those set forth in the original offer. *See Mid-South Packers, Inv. v. Shoney's, Inc.*, 761 F.2d 1117, 1123 (5th Cir. 1985). But G&G issued its invoices after it had already accepted Ebro's purchase orders in writing and performed its entire obligation—shipping the peppers—under the terms of the purchase orders. It is true that a written confirmation issued after performance may "act as an acceptance" and therefore may be enforced if the confirmation is "a writing necessary to satisfy the statute frauds when the agreement reached is at least partially unenforceable." *Id*. Here, however, G&G signed the purchase orders, and there was thus no need for the invoices to act as acceptances, and so there is no need to impute additional terms into the parties' already enforceable written contract. *See id.* at 1123 n.6 (collecting cases expressing doubt as to whether a writing sent after a written acceptance and performance may operate as a confirmation under U.C.C. § 2-207).

Second, assuming that § 2-207 did apply, the attorneys' fees provision would still be unenforceable because it materially altered the parties' contracts and Ebro did not accept it. *See*

6

*Johnson Tire Serv., Inc. v. Thorn, Inc.*, 613 P.2d 521, 523 (Utah 1980) (attorneys' fee provision was a material alteration under U.C.C. § 2-207); *Herzog Oil Field Serv., Inc. v. Otto Torpedo Co.*, 570 A.2d 549, 551-52 (Pa. Super. 1990) (same). In *Trans-Air International, Inc v. Northern Adhesive Co.*, 882 F.2d 1254 (7th Cir. 1989), the Seventh Circuit explained that a "material alteration" in a confirmation under § 2-207 is any term that would be a surprise or hardship to the recipient:

> Section 2-207 of the Illinois Commercial Code provides that additional terms included in a written confirmation "are to be construed as proposals for addition to the contract" and will not become part of the contract if "they materially alter it." *See* Ill. Ann. Stat. ch. 26, para. 2-207(2) (Smith-Hurd 1963); *McCarty v. Verson Allsteel Press Co.,* 89 Ill. App. 3d 498, 411 N.E.2d 936, 44 Ill. Dec. 570 (1980). A term is considered to be a material alteration if its inclusion would "result in surprise or hardship if incorporated without express awareness by the other party." Ill. Ann. Stat. ch. 26, para. 2-207 Comment 4 (Smith-Hurd 1963); *Clifford-Jacobs Forging Co. v. Capital Eng'g & Mfg. Co.,* 107 Ill. App. 3d 29, 32, 437 N.E.2d 22, 24, 62 Ill. Dec. 785, 787 (1982); *see also Chicago Litho Plate Graining Co. v. Allstate Can Co.,* 838 F.2d 927, 931 (7th Cir. 1988).

*Id.* at 1260.

The analysis in *Trans-Aire* determines the hardship created by G&G's attorneys' fees provision. In *Trans-Aire*, the timeliness of a proposed contract modification was not an issue. Rather, contrary to an earlier oral agreement that a proposed sale would be without warranties as to the effectiveness of the goods sold, the purchaser inserted an indemnification provision into its purchase orders that had the effect of warranting fitness for their proposed use. *Id*. at 1260-1262. The court noted that this was a unilateral change—"a shift in legal liability which has the effect of relieving one party of the potential for significant economic hardship and placing this burden upon another party"—and concluded that "a party charged with legal duties and obligations" cannot "reasonably rely upon a boilerplate clause in a boilerplate form and a corresponding operation of law to shift substantial economic burdens from itself to a nonassenting party." *Id*. at

7

1263. Accordingly, the court found that the indemnification clause imposed a hardship on the seller. *Accord Union Carbide Corp. v. Oscar Meyer Foods Corp.*, No. 89 C 3834, 1990 WL 156313, at *3-4 (N.D. Ill. Oct. 12, 1990) (adopting *Trans-Aire*'s rationale in refusing to enforce a clause that unilaterally imposed tax liabilities on one party to a transaction).

The same outcome results here. Just as the purchaser in *Trans-Aire*, without its proposed modification, was itself liable for any failure of the goods to perform, so G&G, before its invoices were issued, was liable for its own attorneys' fees.[7] G&G's attorneys' fees provision had the effect of unilaterally transferring that significant economic burden to Ebro. The materiality of the change is highlighted by its unilateral nature. G&G did not propose that the losing party in any action involving the contract would pay the successful party's attorneys' fees; it only provided that Ebro would pay all attorneys' fees that G&G incurred in collection actions. Ebro did not expressly consent to this provision, and there is no evidence that the parties had any course of dealing from which Ebro's consent could be implied: the only three transactions reflected in the record took place within a few days of one another. Thus, even if timely, the attorneys' fee provision did not become part of the contract.

B. *G&G's PACA trust claim.*

Congress enacted PACA in 1930 to promote fair trading practices in the produce industry and to protect small farmers whose survival depends on prompt payment by purchasers. *See Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 671 (7th Cir. 2002); *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 199 (3d Cir. 1998). Among other things, PACA authorizes the Secretary of Agriculture to license merchants, dealers, and brokers

---

[7] In the absence of a contrary contractual provision or special rule of law, the "American Rule" requires all parties to bear their own legal expenses. *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 448 (2007).

8

who deal in "[f]resh fruits and fresh vegetables of every kind and character." 7 U.S.C. § 499a(b)(4)(A). Those dealers who fail to make "prompt payment" are subject to civil penalties and revocation of their PACA licenses. 7 U.S.C. §§ 499e-499h. "Prompt payment" is defined by the Secretary of Agriculture's regulations: the default rule is that payments are due within 10 days after receipt of shipment, 7 C.F.R. § 46.2(aa) (2006), although parties can also "elect to use different times of payment." 7 C.F.R. § 46.2(aa)(11) (2006).

In 1984, Congress amended PACA to provide "growers and sellers of agricultural produce with a self-help tool enabling them to protect themselves against the abnormal risk of losses resulting from slow-pay and no-pay practices by buyers or receivers of fruits and vegetables." *Cooseman Specialties, Inc. v. Gargiuilo*, 485 F.3d 701, 705 (2d Cir. 2007) (internal quotations and citations omitted). Under the amended act, any produce received by a licensed buyer and any proceeds from the produce "are held in a non-segregated, floating trust for the benefit of unpaid suppliers who have met the applicable statutory requirements." *Idahoan Fresh*, 157 F.3d at 199; *see also* 7 U.S.C. § 499e(c). This trust is both effective and unusual, giving sellers a "beneficiary status that permits them, in the case of defaults, to trump the buyers' other creditors, including secured ones." *Cooseman*, 485 F.3d at 705 (quoting *Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A.*, 362 F.3d 33, 38 (2d Cir. 2004)); *accord Patterson*, 307 F.3d at 669. Also, because PACA contemplates that a buyer's assets will be commingled, there is no requirement that a trust beneficiary trace trust assets. *See Sanzone-Palmisano Co. v. Seaman Enters., Inc.*, 986 F.2d 1010, 1012-13 (6th Cir. 1993). Instead, the buyer is given the "virtually impossible" burden of showing that its assets have no connection to the proceeds of produce received under PACA. *Id.* at 1014. Accordingly, assuming that a seller has complied with all of the statutory and regulatory requirements, in the vast majority of cases PACA provides the seller

9

with a trust that attaches to any of the debtor's assets, regardless of whether they can actually be traced to the sale of produce, and the trust funds are free of any claims of the debtor's bankruptcy estate. *See id.* at 1012-13.

The holder of a PACA trust claim has the option of enforcing the claim in a two-step process.[8] First, a claimant obtains a reparations order from the Secretary of Agriculture holding that a dealer has failed to make prompt payment. *See* 7 U.S.C. § 499f & g. The defendant must either pay the reparations award, appeal the Secretary's decision to the district court, or suffer suspension of its PACA license. *See United Potato Co., v. Burghard & Sons, Inc.*, 18 F. Supp. 2d 894, 896 (N.D. Ill. 1998) (citing *Chidsey v. Geurin*, 443 F.2d 584, 586-87 (6th Cir. 1971)). The reparations order itself does not, however, create an enforceable obligation to pay any sum of money, and the defendant faces only the loss of its PACA license for non-payment. *Id*. at 896-97(citing *O'Day v. George Arakelian Farms, Inc.*, 536 F.2d 856, 859 n.3 (9th Cir. 1976), and *Chidsey*, 443 F.2d at 586-87)). To collect amounts due under the parties' contract, the claimant must file suit in federal district court under 7 U.S.C. § 499g(b). *Id*. Although the Secretary's findings constitute prima facie evidence of the facts in the reparations order, the district court proceeding is a de novo trial, and the defendant may raise new defenses. 7 U.S.C. § 499g(b) ("Such suit in the district court shall proceed in all respects like other civil suits for damages, except that the findings and orders of the Secretary shall be prima-facie evidence of the facts therein stated . . . ."); *United Potato*, 18 F. Supp. 2d at 896-97; *A. Sam & Sons Produce Co. v. Sol Salins, Inc.*, 50 Agric. Dec. 1044, 1059 (1991) ("[I]t is evident that the action in the district court [to enforce a repatriation order] is a trial de novo based on the pleadings before the Secretary.").

---

[8] A claimant has the alternative of enforcing the claim directly, by a breach of trust lawsuit, in federal district court. 7 U.S.C. § 499e(c)(5).

In this case, G&G obtained a reparations order from the Secretary, and it is now seeking to enforce the order under 7 U.S.C. § 499g(b). Ebro, however, contends that G&G did not comply with all of PACA's statutory requirements and G&G therefore is not entitled to a trust, but rather is a general unsecured creditor of Ebro's bankruptcy estate.

Ebro is correct. Because of the special nature of the PACA trust provisions, "PACA establishes strict eligibility requirements." *Patterson*, 307 F.3d at 669. First, the supplier seeking a PACA trust must have sold produce on a cash or short-term credit basis. *Id*. Pursuant to the Secretary of Agriculture's regulations, "[t]he maximum time for payment for a shipment to which [parties] can agree and still qualify for coverage under the trust is 30 days after receipt and acceptance." 7 C.F.R. § 46.46(e)(2) (2006). Second, the supplier must comply with the extensive notice requirements set forth in 7 U.S.C. §§ 499e(c)(3) & (4) and 7 C.F.R. § 46.46(f) (2006).

Of relevance here, PACA:

• requires a seller to give notice to the purchaser of the seller's intent to preserve its trust rights within 30 days after payment is due;[10]

• provides that payment is due within either (1) the default 10-day period set by the Secretary, or (2) "such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction";[11] and

• imposes additional notice requirements on the seller if the parties do agree in writing to a time period different from the 10-day period set by the Secretary of Agriculture—specifically

---

[10] 7 U.S.C. § 499e(c)(3).

[11] *Id.*

11

that "the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction."[12]

Ebro argues that the parties agreed in writing to a payment period different from the 10-day default rule because the purchase orders provided for payments to be due "Net 30 days," and that G&G was therefore required to disclose these payment terms on all documents relating to the transactions, including the invoices. Instead, G&G simply wrote "PACA 'terms'" on the invoices. (Ebro Ex. 8-10.)[13]

G&G's responds that under 7 U.S.C. § 499e(c)(3) any agreement on payment terms must be "expressly agreed to in writing before entering into the transaction." G&G contends that the purchase orders do not meet this requirement for three reasons: (1) they are not agreements

---

[12] *Id*. The full text of 7 U.S.C. § 449e(c)(3) reads:

> The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, [or] (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction. . . . The written notice to the commission merchant, dealer, or broker shall set forth information in sufficient detail to identify the transaction subject to the trust. When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction.

[13] G&G does not argue that writing "PACA terms" on the invoices is sufficient to satisfy the notice requirements when parties have agreed to payment terms longer than the 10-day default period. And indeed, that argument would conflict with the regulatory notice requirement. Because the regulations establish 10 days as the default payment period, the phrase "PACA terms" can refer to only the 10-day period and therefore provides no notice of a different period agreed to by the parties. *See Nature Quality Vine Ripe Tomatoes v. Rawls Brokerage, Inc.*, 536 F. Supp. 2d 1259, 1268 (N.D. Ala. 2005) ("Seald-Sweet failed to disclose the 30-day extended payment term on any of the documents related to the fourteen transactions for which Seald-Sweet seeks trust benefits. Instead, Seald-Sweet's invoices stated 'PACA Terms.'").

12

entered into "before . . . the transaction" because they are incomplete and a full "written agreement" came into existence only after G&G shipped the peppers; (2) even if there was a written agreement when G&G accepted the purchase orders, this was not "before . . . the transaction" because entering into a contract for the sale of commodities is itself part of a "transaction"; and (3) G&G's failure to give notice of the 30-day payment terms on its invoices is a minor deficiency that should not bar its trust claim.

None of these arguments is persuasive. *First*, once G&G accepted the purchase orders, they became a written agreement of the parties. The Seventh Circuit has held that courts must apply the statute of frauds to determine whether parties entered into a written agreement for PACA purposes:

> . . . PACA rights are lost whenever the parties enter into a written agreement that satisfies the generally applicable Statute of Frauds. Nothing in either PACA itself or the policies that lie behind it justifies the judicial creation of a rule that can be satisfied only by a formally executed document with the word 'CONTRACT' typed at the top.

*Patterson*, 307 F.3d at 671; *accord Bocchi Americas Assocs., Inc. v. Commerce Fresh Mktg., Inc.*, 515 F.3d 383, 391 (5th Cir. 2008); *Agri-Sales, Inc. v. United Potato Co.*, 436 F. Supp. 2d 967, 973 (N.D. Ill. 2006). As discussed above, the purchase orders—signed by both parties—satisfy the statute of frauds and thus qualify as written agreements on payment terms for purposes of 7 U.S.C. § 499e(c)(3).

*Second*, the parties did enter into their written agreement, via the purchase orders, "before entering into the transaction[s]." 7 U.S.C. § 499e(c)(3). PACA does not define "transaction" and the word may have different meanings, including "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract." Black's Law Dictionary 1635 (9th ed. 2009). From this definition, it could be concluded, as G&G

13

argues, that the "formation" of the parties' contract was itself the transaction, and so agreement on payment terms came at the same time as—not before—entering into the transaction. On the other hand, "performance" could also be the transaction referred to in the statute, so that, as Ebro argues, the payment terms in the purchase orders were agreed to before the transaction, shipment of peppers, involved in each contract.

At least two courts have adopted the second, narrower interpretation, ruling that "transaction" refers to performance—the delivery of goods—and not more broadly to contract formation. In *In re Richmond Produce*, 112 B.R. 364, 374 (Bankr. N.D. Cal. 1990), the court found that parties entered into an agreement to extend PACA's default payment terms before the "transaction" because the letters constituting that agreement "were furnished well prior to delivery of the produce, and thus preceded the sale transaction as required by 7 U.S.C. Section 499e(c)(3)(ii)." Similarly, the court in *In re Delyser*, 295 B.R. 430, 432-33 (Bankr. W.D.N.Y. 2003), determined that a "confirmation of sale memorandum" constituted both the parties' contract and a pre-transaction agreement on extended payment terms because it was executed before the goods were delivered. The seller's failure to disclose the extended payment terms on its invoices prevented it from establishing a PACA trust claim. *Id.* at 436.

Further support for the narrower view of "transaction" can be found in the U.S.D.A.'s administrative decisions. *In re The Caito Produce Co.*, 48 Agric. Dec. 602, 607-610 (1989), treated § 499e(c)(3)(ii) as requiring that any extended payment terms be agreed to "at the time the contract is made" and so denied enforcement to extended terms entered into "after the contract was made and the produce was delivered." Again, delivery rather than contract formation is the "transaction" that cuts off the time for extended payment terms. *Accord In re*

14

*Ocean View Produce, Inc.*, PACA Docket No. D-08-0064, 2009 WL 218027, at *1 (U.S.D.A. Jan. 16, 2009).

No published authority contracts the approach in *Richmond Produce, Delyser* and the U.S.D.A. decisions, and that approach is consistent both with the purposes of the PACA and with commercial practicality. As already discussed, the primary purpose of the PACA trust is to protect suppliers who sell on short-term credit to purchasers of questionable financial status. *See Patterson*, 307 F.3d at 669; *Caito*, 48 Agric. Dec. at 609. Requiring parties to agree on payment terms before the goods are shipped protects sellers because they have maximum leverage at that time; after the purchaser acquires possession, the seller is in a much weaker position to negotiate payment terms. *Caito*, 48 Agri. Dec. at 609 (citing *In re Gilardi Truck & Transp., Inc.*, 43 Agric. Dec. 118, 122-23 (1984)). On the other hand, requiring parties to enter into a separate, free-standing agreement on payment terms not only before shipment of the goods but also before execution of a sale contract, provides no additional protection and imposes additional transaction costs, harming the sellers PACA is meant to benefit.[14]

*Finally*, G&G argues that its failure to comply with the notice requirement should not deprive it of a trust claim because the payments were still due within the maximum period permissible under the Secretary's prompt payment regulations, 7 C.F.R. § 46.46(e)(2) (2006), and because G&G largely complied with the PACA requirements. However, many courts—including the Seventh Circuit—have noted that sellers must strictly comply with PACA to obtain

---

[14] Moreover, it would contradict what Congress found in 1984 to be a "long-standing industry practice" that payments are timely if they are "made within the time agreed upon by the parties at the time they make their contract." H.R. Rep. 98-543, at 6 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410. Given Congress's awareness of this industry practice and its intent to provide produce sellers with greater protections, it is improbable that Congress intended to impose additional requirements that would conflict with industry practice, particularly in the form of unheard-of pre-contractual agreements.

15

the benefit of the floating trust. *See Patterson*, 307 F.3d at 669 ("In return for its protections, PACA establishes strict eligibility requirements."); *Bocchi*, 515 F.3d at 389 ("PACA imposes a strict set of requirements on produce sellers seeking to benefit from the law's protections."); *Am. Banana,* 362 F.3d at 42 ("Strict eligibility requirements accompany the extraordinary protection afforded by PACA's trust provision."); *In re San Joaquin Food Serv., Inc.*, 958 F.2d 938, 940 (9th Cir. 1992) ("[T]his is not a case where 'substantial compliance' with statutory requirements excuses [a party's] omission.").

Because the statute mandates that "the terms of payment *shall* be disclosed on invoices," 7 U.S.C. § 499e(c)(3) (emphasis added), G&G's failure to make these disclosures bars it from establishing a trust claim under PACA. *See San Joaquin*, 958 F.2d at 940 ("The clear command of this language is that a failure to include payment terms in invoices divests the seller of trust benefits."); *Nature Quality*, 536 F. Supp. 2d at 1268 (claimant was ineligible for trust claim because it wrote "PACA terms" on its invoices rather than disclosing the extended payment terms); *Delyser*, 295 B.R. at 436 ("Should a seller fail to include the payment terms previously agreed to by the parties in writing on the very invoice that it elects to use to give notice of its intent to preserve the PACA Trust, it loses the benefits of the Trust.")  The failure to provide the required notice means that no trust ever arose.

## Conclusion

For the reasons stated above, G&G is entitled to a general unsecured claim in the amount of $43,946.60 (consisting of the principal amount of $42,290 plus 2.3% interest from November 1, 2007 to the petition date and $300 in costs), and Ebro is entitled to judgment on the question of a PACA trust.  The judgment will be entered in a separate order.

Dated: February 1, 2010

_____
Eugene R. Wedoff
United States Bankruptcy Judge